**Rachel E. MATLIN, Appellant,**

v.

**Daymond R. LANGKOW and Stephanie Wiley, Cross–Appellants.**

**Nos. 02–1007, 02–1138.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Dec. 11, 2002.

Decided Jan. 22, 2003.

Before: FUENTES, and GARTH, Circuit Judges, and WALLACH, Judge.*

OPINION

GARTH, Circuit Judge.

This case arises out of a lawsuit related to an automobile accident that occurred in Tampa, Florida in March 1997. Following a jury trial, the jury returned a verdict of $200,000 in favor of the plaintiff, Rachel Matlin. The district court, pursuant to its pre-trial ruling applying Florida's collateral source rule to the receipt of $100,000 by Matlin from her Underinsured Motorist ("UIM") policy, reduced the award to $100,000.

Matlin appealed the reduction of her award at No. 02–1007. The defendants, Daymond R. Langkow and his wife, Stephanie Wiley Langkow ("the Langkows"), cross-appealed at No. 02–1138, alleging a variety of trial and pre-trial errors.

We have reviewed the Langkows' arguments and find them unpersuasive. Accordingly, we will affirm the judgment of the district court as to the cross-appeal (02–1138). As to Matlin's appeal, however, our application of Florida law requires us to reverse the judgment, which had held that UIM benefits were a collateral source under Florida law, and thus must be offset against the Matlin's verdict.

I.

Because we write solely for the benefit of the parties, we recount the facts and the procedural history of the case only as they are relevant to the following discussion.

On March 9, 1997, Stephanie Wiley Langkow, while driving her car in Tampa, Florida, hit Matlin's car from behind. Matlin pursued a claim for UIM benefits from her own insurance company, GEICO, because the Langkows had maintained only $10,000 in automobile insurance coverage. Matlin reached an agreement with GEICO in April 1999 to receive UIM benefits of $100,000, the limit under her policy. Nearly three years after the accident, on March 3, 2000, Matlin filed a lawsuit against the Langkows, alleging that their negligence had resulted in injuries and thus damage to Matlin.

The Langkows filed a motion for summary judgment, claiming that Matlin's action was barred because New Jersey's two-year statute of limitations, rather than Florida's four-year statute of limitations, applied to Matlin's complaint. The district court denied their motion on April 30, 2001, holding that Florida's statute of limitations applied.

The Langkows also filed a motion to dismiss Matlin's complaint on the basis of her failure to comply with court orders relating to discovery. The Magistrate Judge denied this order on May 9, 2001.

The district court then raised *sua sponte* the issue of whether Florida's statutory collateral source rule applied to reduce any potential verdict Matlin might receive by the amount she had already received through GEICO's payment of UIM benefits. The district court requested letter briefing and argument from the parties, after which the court concluded that, pursuant to Florida's collateral source rule, any award of damages would be reduced by $100,000, the amount of UIM benefits

* Honorable Evan J. Wallach, United States Court of International Trade, sitting by designation.

received by Matlin.[1] The court entered an order to that effect on May 21, 2001.

Matlin and the Langkows made pre-trial motions related to Matlin's expert witness, Dr. Kalmon Post. Matlin moved in part to strike portions of Dr. Post's videotaped deposition because Dr. Post's file contained a note making reference to a telephone call by Matlin's attorney to Dr. Post's office. The Langkows cross-moved to bar Dr. Post's opinions on the issues of causation and need for future surgery. The district court, in an order dated October 5, 2001, denied the Langkows' cross-motions and also denied Matlin's motion concerning the note.

A jury trial proceeded from October 16 to October 22, 2001, on which date the jury returned a verdict for Matlin for $200,000. The district court entered a final judgment on October 31, 2001 in favor of Matlin, molding the award by reducing the verdict to $100,000 in accordance with its prior ruling that, pursuant to Florida's collateral source rule, it would reduce any verdict obtained by the $100,000 Matlin had received in UIM benefits.

On December 12, 2001, the district court denied the Langkows' motion under Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law notwithstanding the jury's verdict, or in the alternative, for a new trial pursuant to Rule 59(a).

Matlin filed a timely appeal, and the Langkows filed a timely cross-appeal.

## II.

The district court had subject matter jurisdiction over this diversity action. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Matlin's sole argument on appeal is that the district court should not have applied Florida's collateral source rule, Fla. Stat. Ann. § 768.76, to reduce the jury's award. Florida's collateral source rule provides that where damages are awarded to compensate a claimant for injuries sustained, the court shall reduce the verdict by all amounts which have been paid for the benefit of the claimant from all collateral sources, *except* those sources for which a right of subrogation or reimbursement exists. The statute provides:

*In any action* to which this part applies in which liability is admitted or is determined by the trier of fact and *in which damages are awarded to compensate the claimant for losses sustained, the court shall reduce the amount of such award by the total of all amounts which have been paid for the benefit of the claimant,* or which are otherwise available to the claimant, *from all collateral sources; however, there shall be no reduction for collateral sources for which a subrogation or reimbursement right exists.* Such reduction shall be offset to the extent of any amount which has been paid, contributed, or forfeited by, or on behalf of, the claimant or members of the claimant's immediate family to secure her or his right to any collateral source benefit which the claimant is receiving as a result of her or his injury.

Fla. Stat. Ann. § 768.76(1) (emphasis added).

■ The district court raised this issue *sua sponte,*[2] and after letter briefing and

---

**1.** Matlin also received Personal Injury Protection (PIP) benefits of $16,994. The district court did not reduce the verdict for Matlin by this amount because the parties agreed that medical expenses for which the PIP benefits were used would not be introduced at trial. *See* Matlin App. 84–86.

**2.** Matlin complains that the district court should not have raised this issue on its own,

argument, concluded that the collateral source rule would apply to reduce the judgment, if any, by $100,000, the amount of UIM benefits Matlin had received.

We have plenary review of the district court's interpretation and application of state law. *See, e.g., Horsehead Industries, Inc. v. Paramount Communications, Inc.*, 258 F.3d 132, 140 (3d Cir.2001). We have on prior occasions explained that

> [a]s a federal court sitting in diversity, the district court was, and we are, obliged to apply state substantive law.... In so doing, we are not free to impose our own view of what state law should be; we are to apply state law as interpreted by the state's highest court.... In the absence of guidance from that court we are to refer to decisions of the state's intermediate appellate courts for assistance in determining how the highest court would rule.

*McKenna v. Pacific Rail Service*, 32 F.3d 820, 825 (3d Cir.1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) (other citations omitted).[3]

Matlin raises two arguments: first, that the collateral source rule does not cover UIM benefits; and second, that even if UIM benefits were held to come within the meaning of "collateral sources" under the statute, then since a right of subrogation existed, according to Matlin, the collateral source rule does not apply.

The district court appeared to assume that UIM benefits were a collateral source under the Florida statute, § 768.76. It then held that the collateral source reduction *should apply* when it determined that, pursuant to subsection § 768.76(7),[4] no right of subrogation existed.

We have concluded, however, and contrary to the district court, that Florida courts would hold that UIM benefits are *not* a collateral source under § 768.76. The statute defines collateral sources as follows:

> (a) "Collateral sources" means any payments made to the claimant, or made on the claimant's behalf, by or pursuant to:
>
> 1. The United States Social Security Act, except Title XVIII and Title

---

but cites no authority in support of its claim. To the contrary, the Supreme Court's guidance suggests that the district court's raising of the collateral source issue *sua sponte* was permissible. In *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), the Court stated, "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* at 99, 111 S.Ct. 1711. Because Florida law governed Matlin's claim, the question of the applicability of Florida's collateral source rule was a legitimate issue relating to the "construction of governing law."

3. A district court applies the forum's law to determine what substantive law applies. Here, the district court applied New Jersey's choice-of-law rules and determined that Flori-

da law should be applied in this case. We agree.

4. That subsection provides:

> Within 30 days after receipt of the claimant's notification of intent to claim damages from the tortfeasor, the provider of collateral sources must provide the claimant or claimant's attorney a statement asserting its payment of collateral sources benefits and right of subrogation or reimbursement. *Failure of the provider of collateral sources to provide such statement to the claimant or claimant's attorney within the 30–day period shall result in waiver of any claim to subrogation or reimbursement by the provider with respect to any such collateral sources. No right of subrogation or reimbursement shall exist for a provider of collateral sources that has waived its right of subrogation or reimbursement pursuant to this subsection.*
>
> *Id.* § 768.76(7) (emphasis added).

XIX; any federal, state, or local income disability act; or any other public programs providing medical expenses, disability payments, or other similar benefits, except those prohibited by federal law and those expressly excluded by law as collateral sources.

2. *Any health, sickness, or income disability insurance; automobile accident insurance that provides health benefits or income disability coverage; and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by her or him or provided by others.*

3. Any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental, or other health care services.

4. Any contractual or voluntary wage continuation plan provided by employers or by any other system intended to provide wages during a period of disability.

*Id.* § 768.76(2) (emphasis added).

Amendments effective October 1, 1993, to the Florida statute did not change the relevant definition of "collateral sources"; the amendment only modified subsection 768.76(2)(a)1, not relevant here. The 1993 amendment also added subsections 768.76(5)-(9), none of which is relevant in this case. In other words, § 768.76(2)(a)2, the one relevant subsection affecting Matlin's claim, remained precisely the same both before and after the amendments. This being so, Florida case law *prior* to the amendments is just as operative as Florida case law *subsequent* to the amendments.

The Florida courts have characterized uninsured motorist or underinsured motorist benefits as not constituting a "collateral source." In *International Sales–Rentals Leasing Co. v. Nearhoof,* 263 So.2d 569 (Fla.1972), the Florida Supreme Court held that the collateral source rule did not require the set-off of uninsured motorist benefits.[5] Reviewing the decision of the intermediate appellate court, the *Nearhoof* court stated:

Neither [of two other Florida statutory provisions] authorizes such a set-off of insurance benefits received as result of carrying uninsured motorist coverage in favor of a joint tortfeasor. We agree with the reasoning of the [Florida] District Court [of Appeal] *that general principles of law relating to the collateral source rule precludes allowance of such set-off.*

*Id.* at 571 (emphasis added). The *Nearhoof* court explained the reasoning of the intermediate appellate court (of which the Florida Supreme Court approved): that "uninsured motorist coverage is equivalent to a separate contract such as hospitalization insurance so that recovery thereunder may not be set-off from a judgment against a tortfeasor." *Id.* at 570. *See also Economy Fire & Casualty Co. v. Obenland,* 629 So.2d 265, 267 (Fla.Dist.Ct.App. 1993) ("[t]he cautious insured should not be penalized for obtaining UM insurance and, by the same token, it would be unfair for the tortfeasor to benefit by the insured's payment of the UM insurance premium or by the UM insurer's statutorily mandated payments on behalf of the tortfeasor.").

The Florida intermediate appellate courts have held that, per *Nearhoof,* uninsured motorist benefits are not collateral sources that would operate to reduce jury

---

**5.** We have not been informed of any distinction between *uninsured* motorist benefits and *underinsured* motorist benefits. Hence we treat them the same in this opinion.

verdicts. *See Respess v. Carter*, 585 So.2d 987, 990 (Fla.Dist.Ct.App.1991) ("[t]he general principle stated by our supreme court is that the collateral source rule precludes a setoff of UM benefits.") (citing *Nearhoof*, 263 So.2d at 571); *see also id.* at 989 ("the general rule—recognized but not followed by the trial court in order to prevent a windfall from flowing to the plaintiffs—is that a joint tortfeasor is not entitled to setoff for amounts paid by a UM carrier to the injured party") (citing *Nearhoof*); *Economy Fire & Casualty Co.*, 629 So.2d at 267 ("the supreme court has held that uninsured motorist payments are not collateral sources to be deducted from the jury verdict.") (citing *Nearhoof* and *Respess*).

While it may be argued that the benefits which result from UIM coverage would appear to be no different from the benefits resulting from automobile accident insurance benefits in that ostensibly both could be said to respond in damages arising out of an automobile accident, it is clear that Florida's policy is to treat UIM benefits differently from the benefits payable under an automobile accident policy. Florida law, as we have been instructed, holds that uninsured or underinsured motorist benefits do not constitute a collateral source. We are bound by that determination. Accordingly, the district court erred in reducing Matlin's verdict by $100,000, the benefits payable from Matlin's underinsured motorist policy.[6]

### III.

The Langkows raise four arguments in their cross-appeal: (1) that the district court should have applied New Jersey's statute of limitations rather than Florida's

statute of limitations to Matlin's claim, and thus erred in denying their motion for summary judgment; (2) that the district court should have dismissed Matlin's complaint for failure to comply with discovery orders; (3) that the district court erred in denying various motions relating to the testimony of Dr. Post, Matlin's expert witness; and (4) that the district court should have granted their motion for a new trial because the fact of the Langkows' insurance was mentioned at trial and because of Matlin's allegedly false testimony.

As we explain below, we find none of these arguments convincing, and thus will affirm the district court's judgment with respect to all issues raised by the Langkows' cross-appeal.

### A. Applicable Statute of Limitations

The Langkows argue that the district court erred in holding that Florida's four-year statute of limitations, Fla. Stat. Ann. § 95.11(3)(a), applied to Matlin's claim, rather than New Jersey's two-year statute of limitations, N.J. Stat. Ann. § 2A:14–2. They therefore argue that the district court erred in denying their motion for summary judgment. We disagree.

We have plenary review of the denial of a motion for summary judgment. *See, e.g., General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 312–13 (3d Cir. 2001). As explained earlier, we also have plenary review of the district court's interpretation and application of state law.

■ "We have stated that '[a] federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations.'" *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117

---

**6.** As we have concluded that Florida courts would hold that UIM benefits do not constitute a collateral source, we have no need to address Matlin's contention that a subrogation right existed—the other provision in § 768.76(1) for which no reduction is allowed.

(3d Cir.1994) (quoting *Ross v. Johns–Manville Corp.*, 766 F.2d 823, 826 (3d Cir.1985)) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). Accordingly, we must look, as did the district court, to New Jersey's choice of law principles.

The New Jersey Supreme Court has explained that New Jersey's choice-of-law "rule applies a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes v. Kason Corp.*, 145 N.J. 478, 679 A.2d 106, 109 (N.J.1996) (citation omitted). *See also Fu v. Fu*, 160 N.J. 108, 733 A.2d 1133, 1138 (N.J.1999) ("[W]e now apply a more flexible "governmental-interest" test that seeks to apply the law of the state with the greatest interest in governing the specific issue in the underlying litigation."). This test has two prongs: (1) "an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis," *Gantes*, 679 A.2d at 109; and (2) "to determine the interest that each state has in resolving the specific issue in dispute[, an] ... analysis [that] requires the court to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Id.* (citation and internal quotation marks omitted).[1]

In examining the governmental interests at stake, we note that the policies implicated by the Florida and New Jersey statutes of limitation governing tort actions are similar; the statutes differ only with respect to how the states' respective legislatures have chosen to draw the lines for the relevant limitations period. In comparing the competing governmental interests,[2] we must inquire into the "nature of the contacts that the state has to the litigation and to the parties." *Gantes*, 679 A.2d at 110. Thus, in *Fu*, which involved a choice of law question related to an automobile accident involving a rental car and vicarious liability issues, the New Jersey Supreme Court observed:

> In personal injury cases, "the place where the injury occurred is a contact that, as to most issues, plays an impor-

---

1. As to the first prong, it is clear that there is a conflict between the laws with respect to Matlin's claim. Matlin's complaint was filed on March 3, 2000, nearly three years after the accident, which occurred on March 9, 1997. Compl. ¶ 1. Thus, New Jersey's two-year statute of limitations for personal injury actions would bar the claim, whereas Florida's four-year statute would not.

2. In *Fu*, the New Jersey Supreme Court explained that factors identified in the *Restatement (Second) of Conflict of Laws* "guide our evaluation of the governmental interests at stake." *Fu*, 733 A.2d at 1139 (citing *Restatement* §§ 6, 145, 174) With respect to tort law, the Court identified "five categories of interests: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Id.* at 1140–41 (citing *Restatement* § 145, cmt. b).

The last factor—"the competing interests of the states"—is the "most significant" factor. *Id.* at 1142. Under this factor, the "contacts that are most significant [are] ...: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered." *Id.* (citing *Restatement* § 145(2)). The analysis does not depend upon a simple numerical comparison of the contacts but rather, "it is the qualitative, not the quantitative, nature of that state's contacts that ultimately determines whether its law should apply." *Id.* (citation omitted). As noted above, the *Fu* Court explained that the dominant contact is the location where the injury took place.

tant role in the selection of the state of the applicable law." ... *When both conduct and injury occur in a single jurisdiction, with only "rare exceptions, the local law of the state where conduct and injury occurred will be applied" to determine an actor's liability* ... That is so because "a state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." ... The place of injury becomes less important where it is simply fortuitous. *Fu,* 733 A.2d at 1142 (quoting *Restatement* § 145, cmt. d, e) (emphasis added).

■ In the instant case, there is no question that both the conduct resulting in the accident and the injury to Matlin occurred in Florida. Furthermore, at the time of the accident both Matlin and the Langkows were domiciled in Florida. Under the circumstances of this case, it is clear that New Jersey courts, applying New Jersey's choice-of-law principles, would select Florida's four-year statute of limitations.[3] Accordingly, the district court did not err in denying summary judgment to the Langkows on this ground.

### B. *Noncompliance with Discovery Orders*

■ The Langkows next argue that the district court should have dismissed Matlin's complaint for Matlin's failure to comply with certain discovery orders. We review whether a district court should have dismissed an action pursuant to Rule 37 of the Federal Rules of Civil Procedure[4] for abuse of discretion. *See National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) ("The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing."); *Adams v. Trustees of New Jersey Brewery Employees' Pension Trust Fund,* 29 F.3d 863, 870 (3d Cir.1994). In *Adams,* we further explained:

> While we defer to the discretion of the district court, we are mindful that dismissal with prejudice is only appropriate in limited circumstances: "Because [an order of dismissal] deprives a party of its day in court, our precedent requires that we carefully review each such case to ascertain whether the district court abused its discretion in applying such an extreme sanction," ..., and in this review "doubts should be resolved in favor of reaching a decision on the merits[.]"

*Adams,* 29 F.3d at 870 (quoting *Scarborough v. Eubanks,* 747 F.2d 871, 875, 878

---

**3.** The Langkows argue that the district court erred in applying the logic of *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412 (1973). This argument is without merit. First, the New Jersey Supreme Court approvingly cited to *Heavner* in *Gantes.* Furthermore, as the analysis above indicates, the New Jersey Supreme Court has recently reaffirmed that it has adopted the flexible governmental interests test, and our application of that test makes clear that Florida's governmental interests predominate. The Langkows' other arguments on the statute of limitations issue are also without merit.

**4.** In relevant part, that Rule provides:

> If a party ... fails to obey an order to provide or permit discovery ... including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ...
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party ...
> Fed.R.Civ.P. 37(b)(2).

(3d Cir.1984)). Given this background, we agree that dismissal was unwarranted where both parties had violated their discovery obligations.[5]

Of course, we do not condone discovery abuses. Nonetheless, in this case, where none of the parties had complied adequately with their discovery obligations, we will not conclude that the district court abused its discretion in denying the Langkows' motion to dismiss on the ground of Matlin's noncompliance with discovery orders.

## C. Expert Testimony

■ The Langkows filed a pretrial motion to bar the testimony of Matlin's expert witness, Dr. Kalmon Post; as well as post-trial motions for a new trial pursuant to Fed.R.Civ.P. 59 and for judgment as a matter of law notwithstanding the jury's verdict pursuant to Fed.R.Civ.P. 50(b). All of these motions challenged the propriety of the district court's allowing Dr. Post to testify. On appeal, the Langkows claim that the district court erred in denying these motions. The issue underlying the Langkows' appeal of all of these motions is the question of admissibility of the expert testimony. *See* Langkow Br. at 43.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Rule 702 and the other Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786.

We review a district court's determination of the question of admissibility of expert testimony for abuse of discretion. *General Electric Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Elcock v. Kmart Corp.,* 233 F.3d 734, 740–41 (3d Cir.2000). As we have recently stated, "To show an abuse of discretion, appellants must show the district court's action was 'arbitrary, fanciful or clearly unreasonable.' We will not disturb a trial court's exercise of discretion unless 'no reasonable person would adopt the district court's view.'" *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 412 (3d Cir.2002) (quoting *Stich v. United States,* 730 F.2d 115, 118 (3d Cir.1984); *Oddi v. Ford Motor Co.,* 234 F.3d 136, 146 (3d Cir.2000)).

The Langkows identify several reasons why they believe the district court should have found the testimony inadmissible. First, they claim that "Dr. Post had failed to review a single treatment record for plaintiff following the accident, failed to review any depositions, [and] failed to review any interrogatories and none of the discovery in the case." Langkow Br. at 43. Second, they say that Dr. Post's state-

---

**5.** As the Magistrate Judge reasoned:

[T]he Court concludes that dismissal of Plaintiff's case is not appropriate upon this ground. While the Court finds Plaintiff's counsel's explanation for his delay in responding to the Court's directive an insufficient excuse and somewhat remarkable, the delay is not so prejudicial as to warrant dismissal of the Complaint. Moreover, while the responses show minimal effort on the part of Plaintiff and Plaintiff's counsel to comply with their discovery obligations, the Court cannot sanction a party for failure to produce information that she claims she does not possess. Defendants have not shown how their defense is prejudiced by Plaintiff's paltry responses. Further, the record in this case demonstrates that neither party has been very cooperative with the other in producing relevant discovery. The harsh sanction of dismissal will not be imposed where Defendants have not fully and timely complied with their own discovery obligations.

*Matlin v. Langkow,* Civ. No. 00–1120 (D.N.J. May 9, 2001) (Kugler, M.J.), at 5.

ment that Matlin's herniated disc was related to the automobile accident was a subjective view that lacked sufficient support other than the temporal connection drawn by the doctor based on Matlin's description of her history. *Id.* at 45–46. Third, they argue that Dr. Post's "unfounded expert opinion" was particularly suspect where the expert engages in "differential diagnosis," or rules out other possible causes—in this case Matlin's weight-lifting. *Id.* at 49–50. All of the Langkows' criticisms thus boil down to a claim that Dr. Post's expert opinion that the automobile accident caused Matlin's injuries was rendered without sufficient support.

The district court rejected these types of arguments in ruling on the Langkows' motion *in limine.* The court explained that, in its view, the methodology that Dr. Post employed was sufficiently sound to meet the requirements of Rule 702:

> [Dr. Post] was aware of the accident. He was aware of [Matlin's] complaints. He was aware that there was no other trauma reported predating the appearance of her disk problem. He was aware that automobile accidents of this type can cause this sort of injury. So both by deduction and by process of exclusion and based upon his many years as an orthopedic surgeon, he expresses an opinion on causation. I find he is able to express this causation opinion to a reasonable degree of medical certainty under the test of Rule 702. So for these reasons, I find that there is sufficient basis to admit his causation opinion and that the attack on the suffi-

ciency of his factual basis and medical assumptions goes to the weight that the jury may or may not ascribe to his opinion.

*Matlin v. Langkow,* Civ. No. 00–1120 (D.N.J. Oct. 5, 2001) (bench opinion), at 39–40.[6]

The district court's determination that Dr. Post's opinion was sufficiently reliable for purposes of admissibility did not constitute an abuse of discretion. In *Elcock,* we said, "An expert's opinion is reliable if it is based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Elcock,* 233 F.3d at 745 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d Cir.1994) (internal quotation marks omitted), *cert. denied sub nom. General Elec. Co. v. Ingram,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995)).[7] In *In re Paoli,* as Matlin notes, we gave an example of a situation quite similar to the instant matter, and we opined that a doctor's determination as to causation would be admissible in the absence of complete information:

> [S]ometimes differential diagnosis can be reliable with less than full information, and, to the extent that the district court concluded otherwise, we hold that it abused its discretion. To provide a simplistic example, imagine a patient who comes in with medical records that include x-rays showing a fractured arm and who tells the doctor that he hurt the arm in a biking accident; the doctor

6. In ruling on the Langkows' post-trial Rule 50(b) motion, the district court reaffirmed its earlier ruling that Dr. Post's opinion was admissible. *See Matlin v. Langkow,* Civ. No. 00–1120 (D.N.J. Dec. 12, 2001) (bench opinion), at 19–22.

7. We have explained that "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock,* 233 F.3d at 741 (citation omitted). The Langkows' argument focuses on the reliability of Dr. Post's testimony; questions of qualifications or fit are not at issue in this appeal.

could reliably conclude that the patient had a fractured arm caused by a biking accident even without physically examining the patient or taking a medical history. The biking accident is so much more likely to have been the cause of the fracture than anything else that there is no need to examine alternatives.

*In re Paoli,* 35 F.3d at 759–60 (footnote and citation omitted).

Here, Dr. Post examined Matlin, and, given Matlin's statement to him about the automobile accident, reached the conclusion that the injury he diagnosed had been caused by the automobile accident. The district court found that Dr. Post's conclusions were admissible as an expert opinion. The district court's admissibility decision was thus in accord with *In re Paoli,* and we cannot say that the court abused its discretion in the way in which it determined that the testimony was reliable. As the Supreme Court has explained, "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (emphasis in original).[8]

Our decision in *Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802 (3d Cir. 1997), which the district court cited, provides further support for the district court's decision. There, we held that where a doctor, testifying as an expert, concluded that " '[t]he temporal relationship and the nature of her complaints lead me to conclude that with reasonable medical certainty, the cause of [the plaintiff's] Central Nervous System manifestations of toxicity is exposure to Dursban in 1989 to 1990,' " it was an abuse of discretion for the district court to *exclude* the testimony *Id.* at 809 (citing doctor's report). *Kannankeril* therefore suggests that the district court's *inclusion* of similar opinion testimony in the instant case is not an abuse of discretion.

The concerns that the Langkows raised before the district court and on appeal are issues that more properly go to weight rather than admissibility, as the district court correctly noted. *Cf. id.* ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility."). Counsel for the Langkows had an opportunity to raise questions about Dr. Post's testimony at trial, and did so. The Langkows have not shown that the district court abused its discretion in performing its role as a gatekeeper for the admissibility of evidence. Accordingly, we will uphold the district court's judgment against the Langkows' challenges related to Dr. Post's testimony.

### D. Mention of Insurance and Alleged False Statements

█ Finally, the Langkows contend that because Matlin would not stipulate to the authenticity of photographs of her vehicle taken by an insurance adjuster, there was a prejudicial mention of insurance at trial. In addition, they claim that Matlin gave

---

**8.** The Langkows' citation to *Downs v. Perstorp Components, Inc.,* 126 F.Supp.2d 1090 (E.D.Tenn.1999) (Phillips, M.J.), is not to the contrary. In excluding an expert witness's opinion that a single chemical exposure had resulted in injuries to the plaintiff, the court concluded that the "expert opinions are based upon nothing more than conjecture, speculation, and litigation animus," and that the ex-

pert "has allowed his animosity toward the use of chemicals in the modern world to cloud his objectivity." *Id.* at 1129. The causation question in *Downs* would require a more rigorous inquiry than the question in this case; and some of that court's criticisms of the expert's opinion are clearly inapplicable here.

false testimony regarding the timing of certain photographs. The Langkows argue that these circumstances justify a new trial.

These contentions are also without merit. First, the Langkows argue that by failing to stipulate to the insurance adjuster's photographs, Matlin forced a situation where the Langkows had to call the adjuster to testify to the authenticity of the photographs; and that on cross examination and in closing, Matlin's counsel mentioned the issue of the Langkows' insurance. Matlin counters that she had no obligation to stipulate to the photographs, and that she cannot be blamed for the Langkows' strategic choice to call the witness. Furthermore, Matlin notes that the Langkows' counsel initiated the mention of insurance at trial through his own questions to the adjuster on direct examination.

The Langkows cite no authority for the dubious proposition that their opponent's choice not to stipulate to certain evidence resulted in sufficient prejudice to require a new trial. Nor do the Langkows make a sufficient demonstration that, as they allege, Matlin offered false testimony. Under these circumstances we cannot conclude that the district court abused its discretion in not granting a new trial. *See, e.g., Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 383–84 (3d Cir.2002) (identifying abuse of discretion standard).

## IV.

For the foregoing reasons, the judgment of the district court will be AFFIRMED with respect to the issues raised in the cross-appeal. The judgment of the district court concerning the collateral source reduction will be VACATED, and the case will be REMANDED so that the district court may enter a revised judgment for Matlin in the amount of $200,000, thereby recognizing that Florida law does not regard UIM benefits as a collateral source.